# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

KELLY HOWERTON,                          :

      Plaintiff,                       :

  vs.                                    :

CAROLYN COLVIN,                          :
Acting Commissioner of the
Social Security Administration,          :

      Defendant.                       :

Case No. 3:13cv00337

District Judge Thomas M. Rose
Chief Magistrate Judge Sharon L. Ovington

## REPORT AND RECOMMENDATIONS[1]

## I.    <u>Introduction</u>

Plaintiff Kelly Howerton brings this case challenging the Social Security Administration's denial of her applications for Supplemental Security Income and Disability Insurance Benefits.  She applied for benefits in October 2009, asserting that she was under a benefits-qualifying disability starting on November 1, 2008 due to chronic migraines.  The Social Security Administration denied her applications both at the initial administrative hearing and after a hearing before Administrative Law Judge (ALJ) Mary F. Withum.

Plaintiff brings this case challenging ALJ Withum's written non-disability decision.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13), Plaintiff's Reply (Doc. #14), the administrative record (Doc. ##5, 6, 7), and the record as a whole.

Plaintiff seeks an Order remanding the case to the Social Security Administration for payment of benefits.

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 25 years old on her alleged disability onset date. She earned a high school GED in 2003. *See* 20 C.F.R. §404.1564(b)(4), 404.964(b)(4).[2] She worked for short periods of time as a cashier, an assistant manager in a Halloween store, and as a factory worker in a variety of jobs.

During the administrative hearing before ALJ Withum, Plaintiff testified that she had last worked at a seasonal job (in the Halloween store) in 2008. She missed too much work and was let go. (*PageID#* 58). To support herself, she relied upon her mother and boyfriend. *Id.* She can drive but does so only when she does not have a migraine. (*PageID#* 59).

Plaintiff testified that she has three to four migraines per week. (*PageID#* 65). She began getting migraines at age 15. (*Id.*). Her migraines caused her to miss too much high school and she dropped out. (*Id.*). She takes Zoloft and Topomax to help prevent her

---

[2] The remaining citations will identify the pertinent Regulations for Disability Insurance Benefits with full knowledge of the corresponding Regulations for Supplemental Security Income.

2

migraines.  Once a migraine starts, she takes Percocet and Ultram.  If these medications

don't work she will take injections of Nubain and Phenergan.[3]  (*PageID*# 66).

Plaintiff described her migraines as a sharp, throbbing pain in the back of her head.

(*PageID*# 67).  She is very sensitive to both light and sound.  When she starts getting a

migraine, she feels nauseated.  She explained that a weather change can trigger her

migraines as well as eating chocolate, certain smells (really strong perfume), her menstrual

cycle, bright sunshine when she is not wearing her sunglasses, and sometimes television

(when the camera is unsteady).  (*PageID*## 67-68).

As to her activities of daily living, Plaintiff testified that on days when she does not

have a headache, she gets her children ready for school, helps with chores, and plays with

her children.  (*PageID*## 69-70).  On the days when she is suffering from a migraine, she

lies in bed and takes pain pills.  (*PageID*## 68-69).  She explained:

> Sometimes, that'll work.  If it does, then I can get up, and I can play with my
> five year old, or take her outside, or pick up my son from school and do his
> homework with him.  If it doesn't work, then I have to give myself a shot, and
> I'm in bed rest every day....

(*PageID*# 69).  When the injections do not work, she goes to the hospital emergency room.

(*PageID*# 74).

Plaintiff's migraines have left her feeling very depressed because she cannot do the

---

[3] Nubain is a prescription pain medication that "can be habit forming," according to the National Institute of Health.  http://www.nlm.nih.gov/medlineplus (search Drugs and Supplements database). Phenergan treats a variety of health problems, and it helps relax and sedate patients before and after surgery.  *Id*.

things she believes she should be able to.  (*PageID* # 72).

When questioned by her counsel, Plaintiff testified that her migraines often occur without any identifiable trigger.  (*PageID* # 73).  She relies upon the injections about three times per week.  She estimates that she has tried at least 100 preventative medications. When she goes to a new pain specialist, the try new medications and she had experienced allergic reactions to some medications (Vicodin, Toradol, Fiorinal, Fioricet).  (*PageID* # 74).

A family member will drive Plaintiff to the emergency room since she does not drive when she has a migraine.  (*PageID* ## 74-75).  She acknowledged that when she goes to an emergency room, she insists on Nubain and Phenergan because they have worked for her since she was age 15.  (*PageID* ## 75).  For any of her injections to work, she needs to lie down and rest for at least two hours after taking them.  (*PageID* # 76).

### B.    Medical Records And Opinions

The administrative record contains extensive volumes of Plaintiff's medical records, dating from her high school days.  More recently, in January 2011, Plaintiff began treating with primary care physician, Joseph Allen, M.D.  (*PageID* ## 1796-1800).  Initially, Plaintiff reported that she averaged 3 headaches a week with both photophobia and phonophobia. (*PageID* # 1798).  The administrative record contains additional treatment notes through January 2012.  (*PageID* ## 1781-95, 2099-2101).  On January 26, 2012, Dr. Allen completed a check-mark questionnaire in which he opined that Plaintiff suffers from migraine headaches with symptoms including nausea, vomiting, irritability, photophobia, and

increased sensitivity to noise. He opined that Plaintiff's headaches occur more than once per week and last several hours. Dr. Allen could not assess Plaintiff's capability to work during a migraine because he had never seen her experience one. He believed that Plaintiff's migraine headaches would cause her to be absent more than three times per month. And, he opined that her pain was "moderate" on the following pain continuum: none, mild, moderate, severe, or extreme. (*PageID*## 2102-03).

Esberdado Villanueva, M.D. reviewed Plaintiff's records on February 17, 2010, and opined that she has no exertional limitations. He believed that Plaintiff's migraines limited her to work that never requires her to climb ladders/ropes/scaffolds, and she needed to avoid concentrated exposure to noise, fumes, dusts, gases, and poor ventilation. (*PagID*# 649-51). Dr. Villanueva opined that Plaintiff's statements regarding her symptoms and limitations were partially credible. He explained: "[Claimant] says that when she has a headache she cannot do anything. Her doctors report that she has been noncompliant with tx [treatment] and ... appears to be avoiding taking a drug test for eligibility to take narcotic medications; therefore her statements cannot be found fully credible." (*PageID*# 652).

Elizabeth Das, M.D. reviewed Plaintiff's records on July 6, 2010 and "found no new or material changes to initial decision." (*PageID*# 661). She also opined that her review of the "evidence in file from initial level finds no changes needed to initial RFC. Initial RFC confirmed." *Id*. Dr. Mas's references to the "initial RFC" points to Dr. Villaneuava's assessments. *Id*.; *see PageID*## 93-94.

5

### III.    Administrative Review

#### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both Disability Insurance Benefits and Supplemental Security Income.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.

#### B.    ALJ Withum's Decision

ALJ Withum resolved Plaintiff's disability claim by using the five-step sequential evaluation procedure required by Social Security Regulations.  *See PageID##* 37-38; *see also* 20 C.F.R. § 404.1520(a)(4).  Her pertinent findings began at Step 2 of her evaluation where she concluded that Plaintiff had the severe impairment of migraines. (*PageID#* 38).

The ALJ concluded at step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the criteria in the Commissioner Listing of Impairments. (*PageID#* 40).

6

At step 4, the ALJ concluded that Plaintiff retained the residual functional capacity[4] to perform work at all exertional levels, except she should never climb ladders, ropes or scaffolds and should never work at unprotected heights. She should avoid concentrated exposure to strobing, flashing lights, and excessive noise. And she should avoid concentrated exposure to dusts, fumes, odors, gasses, and poorly ventilated areas. (*PageID#* 40).

At step 5, the ALJ considered that Plaintiff's age, 25 years old, placed her the category of a "younger person." *See* 20 C.F.R. § 404.1563(c). The ALJ also considered Plaintiff's residual functional capacity, her high-school education, her work experience, and a vocational expert's testimony to determine if Plaintiff could adjust to work that is available in the national economy. The ALJ concluded that Plaintiff is able to perform a significant number of jobs in the regional economy, including 6,000 jobs as the medium level of exertion such as a housekeeper, hand packager, and laundry worker; 32,000 jobs at the light level of exertion such as a fast food worker, cashier and routing clerk. (*PageID##* 43-44).

The ALJ ultimately found that Plaintiff was not under a disability within the meaning of the Social Security Act from November 1, 2008, through April 6, 2012 (the date of the ALJ's decision). (*PageID#* 44).

---

[4] "Residual functional capacity" is an assessment of the most a claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec*., 276 F.3d 235, 239 (6th Cir. 2002).

7

## IV.   Judicial Review

The Social Security Administration's determination of disability – here, embodied in ALJ Withum's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## V.   Discussion

Plaintiff contends that the ALJ's assessment of her residual functional capacity fails

to account for her symptoms and limitations occasioned by her migraines.  She characterizes the work limitations identified by the ALJ as "barebones," and she argues it was entirely unreasonable for the ALJ to conclude that Plaintiff's migraines would have absolutely no impact on her ability to be a reliable and productive employee.  (*PageID*# 2127).  Plaintiff emphasizes that her medical records document nearly 200 separate emergency room visits from 2008 through the date of the ALJ's decision in April 2012.  She maintains that the ALJ's recognition of her "stereotypical migrained triggers" does not account for her specific symptoms and limitations.  (*PageID*# 2127).  She emphasizes that she has been incredibly consistent is describing her migraines and their effects, particularly that she has "throbbing, pounding pressure and pain in the back of her head with blurred vision, photophobia, poor noise tolerance, nausea, and often vomiting." (*PageID*# 2128).  She further contends that the ALJ's adverse credibility finding is inadequate and not entitled to deference.

Plaintiff also asserts that the ALJ selectively reviewed her emergency room records, and as a result, substantial evidence does not support the ALJ's conclusions.  And she argues that the weight the ALJ gave to the medical source opinions was unreasonable and contrary to 20 C.F.R. §404.1527.

The ALJ determined at step 4 of the sequential evaluation that Plaintiff's description of her migraines – including the intensity, persistence, and limiting effects of her pain and other symptoms – was not credible to the extent it was inconsistent with the limitations set forth in the ALJ's assessment of her residual functional capacity.  (*PageID*# 42-43).

9

The ALJ faced a particularly challenging task when assessing Plaintiff's credibility regarding the severity, persistence, and limiting effects of her migraine pain.  "Pain is an elusive phenomena.  Ultimately, no one can say with certainty that another person's subjectively disabling pain precludes all substantial gainful employment."  *Bobb v. Astrue*, 2:10cv00422, 2011 WL 1238376, at *11 (S.D. Ohio Feb. 23, 2011) (Abel, M.J.).  "Pain is always subjective in the sense of being experienced in the brain."  *Kelly v. Comm'r of Soc. Sec.*, No. 2:10-CV-00775, 2011 WL 4482489, at *2 (S.D. Ohio Sept. 27, 2011).  Given this, an ALJ's credibility determinations are generally entitled to deference:

> It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.  However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility."  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at *4.  Rather, such determinations must find support in the record.  Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."  The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record.  Consistency of the various pieces of information contained in the record should be scrutinized.  Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect.

*Rogers,* 486 F.3d at 247-48 (6th Cir. 2007) (internal citations omitted).  One key feature of these standards is that the social security administration "will not reject [an applicant's] statements about the intensity and persistence of [the applicant's] pain or other symptoms or

about the effect [his or her] ability to work solely because the available objective medical evidence does not substantiate [his or her] statements." 20 C.F.R. §404.1529(C)(2); *see Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (objective evidence of pain itself is not required).

"Medical science confirms that pain can be severe and disabling even in the absence of 'objective' medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). As to migraine pain generally, the National Institute of Health's, National Institute of Neurological Disorders and Strokes explains:

> The pain of a Migraine headache is often described as an intense pulsing or throbbing pain in one area of the head.... [T]he International Headache Society diagnoses a migraine by its pain and number of attacks (at least 5, lasting 4-72 hours if untreated), and additional symptoms include nausea and/or vomiting, or sensitivity to both light and sound.... Migraine is three times more common in women than in men and effects 10 percent of people worldwide.... People with migraine tend to have recurring attacks triggered by a number of different factors, including stress, anxiety, hormonal changes, bright or flashing lights, lack of food or sleep, and dietary substances....
>
> There is no absolute cure for migraine since its pathophysiology has yet to be fully understood....

http://www.ninds.nih.gov/disorders/migraine; *see* The Merck Manual at 1376 (17th Ed. 1999).

Plaintiff testified that weather changes, chocolate, her menstrual cycle, unsteady camera work on the television, bright sunlight, odors, and at times unknown triggers cause her to have a migraine at least three times per week. To prevent the onset of a migraine, she

11

took Topomax and Zoloft every day.  Once a migraine starts, she took either Percocet or

Ultram, which her doctors prescribed for her.  She explains that if her migaine pain is "bad

enough and the medicine doesn't work, I give myself a shot of Nubain and Pernergan if I

have it."  (*PageID*# 66).  She testified that Nubain alleviates her migraine "[m]ost of the

time."  *Id*.  She also explained that Imitrex never helps relieve her migraines but "depending

on how bad the headache, pain pills work.  It just depends on how severe it is when I get it."

*Id*.  She further asserted that physicians have treated her with Morphine, Toradol, Vicadin,

Oxycontin but they do not work.  "The one thing that has worked with the same amount

since I was 15 is Nubain and Phenergan."  (*PageID*# 75-76).

       The ALJ first validly discussed the lack an objective medical support for the severity

of Plaintiff's alleged symptoms.  Plaintiff has repeatedly sought emergency treatment since

she was at least 15 years old, yet testing has never led doctors to diagnose her with any

condition besides headaches or migraines.  Her September 2008 brain MRI revealed no

disorders.  (*PageID*# 278).  More significantly, the ALJ validly referenced or discussed

medical records written by emergency room medical professionals who suspected that

Plaintiff feigned the severity of her migraine pain to satisfy an addiction to Nubain and

Phenergan.  A reasonable mind could accept these relevant medical records as adequate to

support the conclusion that she was exaggerating her migraine pain to cope with her

addiction to Nubain and Phenergan.  *See Blakley*, 581 F.3d at 406.  This is not to conclude

that Plaintiff actually was suffering from an addiction to Nubain and Phenegran.  There are

12

plenty of emergency room records – from nearly 200 emergency room visits, by Plaintiff's count – and a vast number of medical records – nearly 2000 pages – some of which support the view that on many occasions, she genuinely suffered from severe migraine pain that led emergency room physicians to treat her with injections of Nubain and Phenergan in the doses she requests.  Plaintiff's counsel has very helpfully compiled the evidence into charts. *See* Doc. #10, *PageID* at 2119-2120.  But, despite this evidence, the records also show that as time went on, emergency room professionals began to discuss their concern about her possible drug-seeking behavior, and they repeatedly instructed her to follow-up with her treating physicians, which she often failed to do.  Eventually, emergency room personnel discussed their concern about her drug-seeking behavior and warned her that they would not treat her migraine pain with Nubain and Phenergan.  Yet, she later returned to the emergency room asking for Nubain and Phenergan.  Plaintiff's medical records thus presented the ALJ with evidence that, on the one hand, supported Plaintiff's testimony about the persistence, severity, and limiting effects of her severe migraines, but on the other hand, supported the reasonable conclusion that Plaintiff exaggerated her symptoms and limitations for the purpose of obtaining Nubain and Phenergan.  Given the presence of substantial evidence supporting either theory, the ALJ's conclusion that Plaintiff had exaggerated her symptoms and limitations to obtain Nubain and Phenergan was within the ALJ's "zone of choice" when assessing Plaintiff's credibility.  As a result, deference is due the ALJ's credibility findings. *Blakley*, 581 F.3d at 406 ("The substantial-evidence standard ... presupposes that

13

there is a zone of choice within which the decisionmakers can go either way, without interference by the courts."); *see also Poppa v. Comm'r. of Soc. Sec*., 569 F.3d 1167, 1172 (10th Cir. 2009) (drug-seeking behavior compromised the plaintiff's credibility).

Turning to specific evidence, in June 2008, Plaintiff went to the emergency room and was seen by Dr. Kessler. Dr. Kessler diagnosed Plaintiff with an acute migraine headache based on her medical history and examination. Dr. Kessler observed, "[she] does appear to be experiencing symptoms consistent with migraine headache ...." (*PageID*# 336). Dr. Kessler noted her "[e]xamination is completely benign." *Id*. He explained to Plaintiff that he would treat her with intravenous saline and IV medications. She declined that treatment, explaining that Compazene dos not work and the only thing that works is Phenergan 25 mg and Nubain 20 mg. Dr. Kessler then planned IV treatments with Nubain 10mg and Phenergan 25 mg. Plaintiff again declined. She was then discharged from the emergency room. *Id*.

In February 2009, Plaintiff went to the emergency room where she was treated by Dr. Gregory Rodgers, who had seen Plaintiff before. This time, Dr. Rodgers began to suspect that she attempted to steer treatment to obtain Nubain and Phenergan. (*PageID*# 270-71). Plaintiff contends that the ALJ misinterpreted the doctor's report because Physician Assistant (PA) Zedaker, not Dr. Rodgers, expressed the concern about drug seeking. Yet, even if PA Zedaker actually noted this possibility, Dr. Rodgers supervised PA Zedaker, Dr. Rodgers saw and evaluated Plaintiff, and Dr. Rodgers explicitly agreed with the report's

14

assessment and plan. (*PageID*# 270-71). In addition, the fact that Dr. Rodgers treated

Plaintiff with Nubain and Phenergan does not negate the fact that he was beginning to

suspect that Plaintiff was seeking Nubain and Phenergan by frequently visiting the

emergency room.

In May 2009, Dr. Traylor reported that Plaintiff refused treatment after she

"demanded" Nubain and after Dr. Traylor refused to treat her with it. (*PageID*# 410).

Plaintiff counters that this is not indicative of drug-seeking behavior because Dr. Taylor

noted, "I told her I do not ever give narcotic medications for headache ...." *Id.* at 410.

Plaintiff has a point here. The fact that Dr. Taylor did not ever give narcotics to treat

headaches says nothing probative about Plaintiff's credibility. But, the ALJ merely

considered Dr. Traylor's notes with the other evidence of record such as Dr. Roger's

suspicion of drug seeking in February 2009, and – most significantly – the information

provided two months later by Dr. Frantz. In July 2009, Dr. Frantz saw Plaintiff in the

emergency room. The PA Compton's report, with which Dr. Frantz agreed, states:

> I spoke with the patient in detail. She has been here 6 times in one
> month, mainly the month of July. She was here 4 times in June and that is 10
> times in the past 8 weeks for migraine cephalgia [headache]. She has been
> told by other practitioners that she would not [sic] getting narcotic
> medications, namely Nubain for this problem. This is a serious issue[] that she
> continues to come to the emergency department. She believes this is the only
> abortive therapy that works for here. I am very concerned at this point that she
> is getting some sort of medication reaction that she enjoys. She was advised
> less than a week ago that this is becoming a big issue, her frequent visits to the
> emergency room, requesting specifically these medications, and that at some
> point she would not be given anymore, and she expressed understanding of
> that a week ago. I did order her IV fluids, Compazine and Benadryl and she

15

refused this stating that never worked in the past.  Dr. Frantz reevaluated the
patient and felt that she could get hydroxyzine 50 mg, but she refused this as
well.  This again just adds creditability [sic] to our case and suspicion that she
has chronic iatrogenic drug abuse.[5]

(*PageID*# 254) (footnote added).  Dr. Frantz diagnosed Plaintiff with "[c]hronic iatrogenic

drug abuse."  *Id*.  Plaintiff was discharged from the emergency room after refusing the

treatment offered.  *Id*.  PA Compton noted, "she only wanted Nubain 20 mg and Phenergan

50 mg IM [intramuscular].  We did not feel that this is the best treatment for her migraine

cephalgia...."  *Id*.

Plaintiff argues that she understandably refused the suggested alternative

medications because they dramatically departed from previous treatment.  She points out that

when she returned to the same emergency room a month later, she complained that the

alternative medications had not worked.  The record of her emergency room visit one month

later, August 2009, reveals that the focus of her treatment was again influenced by medical

personnel's concern over her drug-seeking conduct.  The report, written by PA Wise who

was working with attending physician Collins, explained:

After the patient's evaluation per Dr. Collins and myself, we discussed
her plan of care.  We talked to this patient in great detail.  The patient was
coming here last month about every three to four days getting her Phenergan
shot.  We did talk with her that at that time she would not be receiving any
more narcotics.  When the patient first arrived I did evaluation, I did discuss
this with her again.  I told her while we treat the headache, I will treat it with

---

[5] "Iatrogenic" or iatrogenesis refers to "[a]ny adverse mental or physical condition induced in a
patient through the effects of treatment....  A guiding principle of health case it to do little harm to
patients while effecting cures – but this ideal is not always achieved...."  Taber's Cyclopedic Medical
Dictionary at 1011 (19th Ed. 2001).

16

... medications [that] were not narcotic.  The patient said that was not going to help....

(*PageID*# 456).  Although Plaintiff initially agreed to some treatment, she later stated that if they were not going to give her Nubain, she would go home.  Meanwhile, PA Wise called Plaintiff's primary care physician, Dr. Martin.  PA Wise explained:

> I ... spoke with Dr. Martin ....  He has only seen her one time.  He did pull her up on the Ohio Reporting System.  The patient had gotten percoset from Dr. Ranganathan in Springfield, but that had not been for a while.  Dr. Martin said the one time the patient was in his office she was actually seen by his nurse practitioner.  She was started on the Topomax and the Ultram.  He recommended that I speak with Dr. Ranganathan's office.  I call Dr. Ranganathan's office and they stated that the patient [sic] very noncompliant with her appointments changing them and there was drug screen they had scheduled for her that she did not come to take and so with that they would not give her more narcotics.  I did discuss this with the patient and she stated that this information was not true.....

(*PageID*# 456-57).

In November 2010, Plaintiff went to the emergency department at Miami Valley Hospital.  Dr. Heitz diagnosed Plaintiff with migraine.  He explained:

> I elected not to treat the patient with narcotic medications including Nubain, as I feel this only increases recidivism and perpetuates the idea that narcotics are indicated for migraine headaches.  I offered her [several medications] ....  The patient elected to leave ... instead of receiving this treatment.
>
> A review of the patient's record shows multiple previous visits.

(*PageID*# 1600).  Plaintiff responds by incorrectly arguing that Dr. Heitz's refusal to provide Nubain contradicted Plaintiff's treatment plan.  Dr. Heitz noted, Plaintiff's treatment plan allowed the ER doctor to decide whether to provide Nubain.  (*PageID*# 1559).  Moreover,

17

Plaintiff incorrectly suggests that Dr. Heitz's principled stand departed dramatically from previous doctors who repeatedly prescribed Nubain and Phenergan without objection or incident.  But, after giving Plaintiff Nubain and Phenergan in May 2010, she was counseled that she needed to follow-up with her primary care physician because the emergency room did not usually treat migraines with narcotic medication.  (*PageID*# 1581).

Similarly, in October 2010, Dr. Collins noted that within five minutes of receiving Nubain, Plaintiff sat up, stated that she felt better, and wanted to leave before her "30 minutes is up." (*PageID*# 1461).  The report written by PA Compton, but with which Dr. Collins agreed after examining Plaintiff, states, "I discussed with the patient at length that she is likely experiencing some degree of rebound narcotic headache and that we would just be perpetuating the problem by continuing to give her Nubain." (*PageID*## 1460-62).

Later that month, Dr. Rosenberry similarly did not treat Plaintiff with Nubain.  His report explains:

> I reviewed her records and saw the significant note that was dictated on October 7, 2010 by Tracy Compton, PA-C, and also Dr. Collins and the fact that the patient is going to several places to get pain medicine fairly regularly. I also feel uncomfortable about giving her any more narcotics.  I gave her the 50mg of Phenergan, recommend she see her pain control physician for further pain medication, continue her home medication....

(*PageID*# 1456).

Plaintiff argues that the ALJ's assessment of her residual functional capacity unreasonably precluded Plaintiff only from exposure to common migraine triggers.  She testified that a variety of identifiable and unidentifiable triggers caused her migraines.  But

18

the ALJ reasonably declined to credit this aspect of Plaintiff's testimony in light of the evidence of her drug-seeking behavior.

In sum, Plaintiff presents much evidence in support of her credibility arguments. This includes, for instance, her nearly 2,000 pages of medical records, consisting in part of the records from her nearly 200 visits to the emergency room; evidence indicating that she has suffered from migraines since age 15 and dropped out of high school because of them; and her "ten years of consistent, comprehensive medical documentation," (*PageID*# 2157). But, the record contains significantly more than a scintilla of evidence that supports the ALJ's credibility finding.  A reasonable mind could conclude that this evidence supports the ALJ's credibility finding and, consequently, deference is given to the ALJ's credibility decision, regardless of whether or not the Court agrees with it.  *Blakley*, 581 F.3d at 406; *see Rogers*, 486 F.3d at 241; *see also Her*, 203 F.3d at 389-90,

Accordingly, Plaintiff's challenges to the ALJ's credibility decision lack merit.  Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241

\* \* \*

Plaintiff contends that the ALJ's allocation of weight to the medical source opinions

19

is unreasonable and contrary to 20 C.F.R. §404.1527.  She argues that the ALJ failed to provide the necessary "good reasons" for rejecting her treating physician, Dr. Allen's, opinion and that the ALJ's conclusion regarding Dr. Allen neglects thousands of pages of objective findings and treatment records.  Plaintiff points out that Dr. Allen's opinions are not contradicted by the state agency reviewing physicians.

The legal standards applicable to evaluating treating and non-treating medical source opinions are found in 20 C.F.R. § 404.1527, are well established, and frequently reiterated in case law.  *See, e.g., Reed v. Colvin*, No. 3:13cv00317, 2014 WL 6673836, at *8 (S.D. Ohio Nov. 24, 2014) (Ovington, M.J.) (and cases cited therein); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013) (and cases cited therein); 20 C.F.R. § 404.1527.

Dr. Allen opined that Plaintiff's migraines occur more than once a week and last several hours, and she would average that her migraines would cause her to be absent from work more than 3 times per month.  (*PageID*# 2102-03).  The ALJ correctly recognized these aspect of Dr. Allen's report.  (*PageID*# 42).  The ALJ provided a good reason for rejecting these opinions – namely, Dr. Allen's acknowledged that he could not assess Plaintiff's capability to work during a migraine because he had never seen Plaintiff experience one.  (*PageID*# 42, 2103).  In addition, the ALJ rejected Dr. Allen's opinion that Plaintiff would average 3 or more absentees per month, explaining, "specific objective findings need to support the level of restriction of being absent from work are not documented, little weight is given to that opinion."  (*PageID*# 42).  In other words, Dr.

20

Allen's internally inconsistent checklist opinion was based on Plaintiff's subjective complaints that the ALJ had reasonably found to lack credibility (for the reasons discussed previously).  The ALJ therefore did not err in rejecting Dr. Allen's opinions.  *See Tate v. Comm'r of Soc. Sec.*, 467 F. App'x 431, 433 (6th Cir. 2012) (ALJ reasonably rejects opinion of treating physician who provides no objective findings to substantiate Plaintiff's discredited subjective complaints); *Lunsford v. Astrue*, 2012 WL 1309265, at *5 (S.D. Ohio Apr. 16, 2012) (R&R Kemp, M.J.) ("if an ALJ finds . . . subjective reports to be unworthy of complete belief, any medical opinion based on such complaints may also be discounted.") (citing *Allen v. Comm'r of Social Security*. 561 F.3d 646, 652 (6th Cir. 2009)).

Meanwhile none of the emergency room doctors who (at most temporarily) treated Plaintiff explained how her headaches, particularly when properly treated, would affect her work-related functioning.  Thus, the ALJ reasonably afforded the most weight to the February 2010 opinion by state agency Dr. Villanueva and July 2010 opinion by state agency Dr. Das, who explained their respective reviews and implicitly agreed that Plaintiff's migraines would not cause abnormal absences, breaks, or idleness.  (*PageID##* 42, 648-49, 652, 661).

Accordingly, Plaintiff's challenges to the ALJ's evaluation of Dr. Allen's opinions lack merit.

**IT IS THEREFORE RECOMMENDED THAT:**

1.    The ALJ's decision be AFFIRMED; and

2.    The case be terminated on the Court's record.


February 11, 2015

s/Sharon L. Ovington
_____
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474  U.S. 140 (1985); *United States v. Walters*, 638 F. 2d 947, 949-50 (6th Cir. 1981).